# THE UNION RAILWAY AND TRANSIT COMPANY

## v.

# JEREMIAH LEAHY.

NEGLIGENCE.—Appellee was injured while engaged in clearing the ash pan underneath his engine. It was not necessary that it should have been done at that particular time, and the place where the engine was stopped was one of especial hazard. The court is of opinion, from all the circumstances of the case, that the injury was caused by appellee's own negligence, and hence he is not entitled to recover.

APPEAL from the Circuit Court of St. Clair county; the Hon. W. H. SNYDER, Judge, presiding. Opinion filed October 6, 1881.

Messrs. G. & G. A. KOERNER, for appellant.

Mr. CHARLES W. THOMAS, for appellee.

BAKER, J. The Union Railway and Transit Company, appellant herein, had quite an extensive system of side tracks, switches and cut-offs at East St. Louis, lying north of Cahokia creek, which were used for the exchanging of cars between a number of the railroads, terminating at East St. Louis and the Transit Company, said company being engaged in the business of transferring cars for these several railroad companies across the bridge and through the tunnel to St. Louis, and from St. Louis to these and other side tracks, where they were taken in charge by the particular company for which they were intended. One of these side tracks was known as the old east track, and it was connected, on the south, with the main track of the Transit Company, and, just north of Stock Yard Avenue, by a switch, with the tracks of the Toledo, Wabash & Western R'y Co. The switch connecting this old east track with the Wabash tracks belonged to and was controlled by the Wabash Company. South of this connection, and south of the point where the injury here in controversy was received, were still other switches which connected this old east track with the tracks of the Chicago & Alton and Indianapolis & St. Louis railways. These several side tracks, including the old east track, were owned by the Transit Company, and were under the control of its yard master. The old east track was used principally for delivering and receiving cars to and from the Wabash Company, but quite frequently, cars of the other roads we have mentioned, and Stock Yard cars, were delivered and received on this track. The locomotives of the Transit Company were quite constantly upon it, moving, switching, leaving and taking freight cars; so also, but less frequently, were the locomotives of the Wabash; and still less frequently the locomotives of the C. & A., the I. & St. L., and other roads were there engaged in like occupations. About four o'clock on the afternoon of November 15th, 1876, a Wabash switch engine, on which appellee was fireman, came on this old east track from the Wabash switch, but whether to

receive cars from the bridge connection, or for purposes having no relation thereto, is uncertain, as the testimony is conflicting on that point.    At all events, it remained there, quiet upon the track, facing and close up against a long row of box cars to the south of it, for ten, fifteen or twenty minutes, or more.    It was a small pony switch engine, and narrower than the box cars to the south, and it stood from thirty to forty feet south of Stock Yard Avenue, the switch connection with the Wabash track being immediately north of the avenue.

The object of the delay was for the purpose of leaving the main track of the Wabash road clear for a passenger train then about due.    While thus waiting on this bridge connection track, appellee, who was only fifteen years old, but had been railroading for some considerable time, and had been firing on this switch engine for about three months, and knew the uses this old east track was put to, got down off of his engine and got under it, for the purpose of cleaning out the ash pan. No one directed him to clean it out, and his engineer was occupied in fixing something in the cab, and did not know he was under the engine.    The ash pan needed cleaning, but there was no pressing necessity for its being emptied immediately, or before the engine would get back to the Wabash yards.    A short time before coming upon this side track the engineer had told him " perhaps the ash pan was full; " and one Howell, who was also in the employ of the Wabash Company, told him, after the engine stopped, that " if he wished to clean out, he had plenty of time."    A locomotive of the appellant company, with a long train of cars from St. Louis, came in on the track on which the Wabash engine was standing, from the south, pushed the cars which stood ahead of it on the track, and shoved the Wabash switch engine a short distance, variously stated at from three to twelve feet.    Appellee, who was under the latter engine cleaning the ash pan, as soon as he heard the alarm given by one of his fellow servants, and the slack of the cars running up on the engine, started to get out as quickly as he could, but the engine wheel caught him and backed over his left leg, just above the ankle; and the leg was afterwards amputated between the ankle and knee.

We are unable to see there was negligence on the part of appellant; it rightfully came in there on its side track with its locomotive and train of cars; this locomotive had Westinghouse steam brakes and could be stopped, and was stopped, within a very short distance; it was proceeding very slowly, at the rate of about two miles an hour, and the cars ahead of it on the track were being coupled as it went, without slowing the train. The engineer and other employes on the train were all at their posts, and attending to their respective duties. The Wabash engine was narrower than the numerous intervening box cars, and neither it or any smoke or steam from it could be seen from the approaching train. The yard master of the Transit Company, who had charge of the bridge connection side tracks, had not been notified the Wabash switch engine would remain idle upon this side track. Nor, could he, or any of the hands on the transit train, reasonably have anticipated, even had they known the other engine was on this track, that the fireman would attempt, in such a place, to get under his engine and clean out the ash pan. And they had a right to assume that the employes of the several railroad companies who had occasion to use this bridge connection track, would have knowledge and notice of the manner in which and purposes for which it was being constantly used, and would shape their own conduct accordingly. As matter of course, the Wabash engine could rightfully go in on that old east track for the purposes of delivering and receiving cars, and doing all necessary switching. Even assuming the right of the switch engine to remain there unoccupied and idle without permission from the yard master of the Transit Company; at all events, if it did so, the employes in charge were bound to regulate their conduct with due reference to the ordinary and constant uses made of this track, not only by appellant but by other and different railroad companies.

We think, from the facts in the case, from the nature of the place, and from the expert testimony in this record, that this bridge transfer track was no proper or safe place for stopping an engine, and even more especially a small pony-engine, that would be hid from view by intervening box-cars, and getting

under such engine for the purpose of cleaning its ash pan. To do so was culpable negligence; but to what extent it was the negligence of appellee himself, or to what extent the negligence of his fellow servants; or to what extent the negligence of the Wabash company, in employing so young and indiscreet a person in so hazardous a service as firing a switch-engine in so dangerous a locality, or otherwise, we deem it unnecessary to here discuss. For the negligence of no one of these is appellant responsible.

. We find it impossible to arrive at any other conclusion than that this transfer track, where the switching and moving of cars and engines was constantly going on, and that, too, by the employes of many different railroad companies, was a very unsafe and hazardous place for such work as appellee was engaged in. Where a jury has passed, and that more than once, upon the facts of a case, we hesitate to interfere with their verdict, and will make all reasonable intendments in favor of the findings. But we have examined with more than ordinary care all the evidence to be found in this record, and think the verdict so greatly against the evidence that it would work a palpable injustice to compel appellant to pay appellee the $2,201 awarded him as damages by the verdict of the jury and judgment of the circuit court. The court below erred in overruling the motion for a new trial. The judgment is reversed and the cause remanded.

Reversed and remanded.